Filed 11/4/25  P. v. Munoz CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084384 |
| v. | (Super.Ct.No. FWV200002608) |
| RAMON OCTAVEO MUNOZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Katrina West, Judge.  Affirmed.

Ramon O. Munoz, in pro. per.; Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In this *Anders/Wende* matter,[1] defendant and appellant Ramon Octaveo Muñoz appeals from the trial court's entry of judgment following a jury verdict convicting him of second degree murder for shooting Fredy Rodriguez to death at a restaurant where Rodriguez worked as a security guard.  (Pen. Code,[2] § 187, subd. (a).)  The jury found true enhancement allegations that defendant personally used a firearm in committing the murder.  (§ 12022.53, subds. (b), (c), (d).)  The trial court sentenced defendant to an aggregate term of 40 years to life in prison, consisting of consecutive life terms of 15 years and 25 years for the murder and fatal firearm use.  (§§ 190, subd. (a); 12022.53, subd. (d).)  The court stayed the additional firearm enhancements.  (§ 12022.53, subd. (f).)  Our independent review on appeal discloses no issues of arguable merit on which to request briefing by the parties.  (See *People v. Johnson* (1981) 123 Cal.App.3d 106, 109 ["an arguable issue" requires "a reasonable potential for success" on appeal].)  As we briefly explain, the issues defendant raises in his supplemental brief also lack any merit to undermine the jury's verdict.  We therefore affirm the judgment.

## BACKGROUND AND OUR REVIEW

Late in the evening of July 10, 2020, eyewitnesses saw defendant shoot and kill Rodriguez at Culichi Town VIP restaurant in Fontana.  The shooting occurred around 11:00 p.m.  Defendant had been sitting with a female companion in the restaurant's outside dining area, where a live band was playing.  Defendant approached another

---

[1] *Anders v. California* (1967) 386 U.S. 738; *People v. Wende* (1979) 25 Cal.3d 436.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

couple's table, where he set a beer down hard on the tabletop, saying, "This is for you." The couple politely declined the drink. Defendant appeared intoxicated.

A waiter had earlier declined to serve defendant a shot of tequila; the waiter gestured to Rodriguez when he saw defendant approach the other couple's table. When Rodriguez came to the table, defendant tried to order the couple a different drink ("whatever he wants"), but Rodriguez redirected defendant away, telling him "it's already been last call." Defendant placed his arm around Rodriguez and leaned in to speak into his ear, but Rodriguez rebuffed him, shrugging defendant away by moving his arms outward. Defendant retreated to his nearby table, where he sat down, but then pulled out a handgun, stood, and rapidly fired six shots at Rodriguez.

The waiter heard the shots and turned to see Rodriguez on the ground. The couple at the table that defendant had approached knew Rodriguez, and the man saw Rodriguez's body "take" the shots. Four of the shots struck Rodriguez and three were fatal. Paramedics tried to render aid at the scene and then transported Rodriguez to the hospital. He died around 1:00 a.m. Video surveillance footage placed defendant at the restaurant on the night of the shooting, as confirmed by his sister. Footage just after the time of the shooting showed defendant tucking what appeared to be a gun into his waistband. An eyewitness identified defendant in a photographic lineup and in court as the shooter, with absolute certainty.

Defendant's friends and his sister testified about his attempts to contact them after the shooting, which he did not disclose. He told them variously that he had an emergency, that he "fucked up" or "messed up," and he needed money and a ride to the

3

airport in Tijuana, Mexico. One of the individuals, Diego Mora, drove defendant to the airport sometime after 2:00 a.m. the night of the shooting.

Investigators learned defendant was the registered owner of a chrome and silver handgun, which matched an eyewitness description of the shooter's weapon. Police found defendant's car first near Mora's house, then at defendant's residence.[RT 4232-4233, 4243} Searches of the vehicle and defendant's residence did not yield a firearm.

Approximately nine months later, in April 2021, defendant was taken into custody by United States Marshals at the United States-Mexico border. He was then turned over to Detective Casey Kirkland of the Fontana Police Department, who transported him to jail in Ontario. Kirkland questioned defendant about the shooting during the drive, after reading defendant his *Miranda* rights. A recording of the interrogation was played for the jury. Kirkland told defendant the shooting had been captured on the restaurant security footage, which was not true. Defendant claimed not to "remember a damn thing" and that he didn't "recall any of it," having "blacked out" from drinking alcohol all day.

Defendant did recall going to the restaurant with his female companion, whom he had just met at his uncle's earlier that day, to hear live music. He asserted he did not remember anything else until, as he drove her home on the freeway after departing the restaurant, it was " 'like I just woke up' " when she asked him " 'what happened, what happened,' " to which he could only respond, " 'well, you tell me,' " and " 'I'm asking you what the fuck did I do?' " At her suggestion, he fled to Mexico, taking a taxi there.

Told by Kirkland that the video footage "basically . . . shows you sitting at the table with the old lady, [you] shoot the security guard . . . and you leave," defendant responded to the shooting allegation, "So, for no reason?" Defendant did not deny shooting Rodriguez; he said that while he had been in Mexico, almost a year, he had "been trying to come up with why." Kirkland told defendant, "[I]f we're being honest, I don't think that you don't remember. I believe you were drunk. I'll give you that. [¶] . . . [¶] But you conveniently don't remember the pieces [about] when it happened." Kirkland noted, "[Y]ou don't remember any of that middle part, but you remember everything else."

Defendant testified. He said he and a friend drank an 18-pack of beer as well as mixed drinks throughout the day, including at a seafood restaurant near defendant's cousin's house, before defendant's friend passed out. Defendant gave a detailed account of how he and his female companion, with whom he had also been drinking, drove defendant's friend's car to that friend's house, followed by another friend, who then drove defendant and the woman to the Culichi Town restaurant, where defendant had left his car earlier in the day. Defendant claimed to be "very drunk" at this point, too drunk to drive; but went inside the restaurant, where he ordered food, two buckets of beer, and requested songs by the band. Defendant claimed to be "beyond drunk," including too inebriated to read the menu or an automated teller machine's screen. According to defendant, the next thing he remembered was seeing people inside the restaurant "running" and everything seemed to be happening in slow motion. The woman grabbed his shoulder and said, "Let's go, let's go." Defendant saw a man wearing black clothing laying on the floor, but

5

did not remember ever speaking to him. He remembered exiting the restaurant to his car, but he did not remember whether he shot the security guard.

Following the jury's verdict, sentencing, and entry of judgment, defendant appealed and this court appointed appellate counsel. Counsel's review of the record and legal research uncovered no arguable issues to raise on appeal, including after consultation with Appellate Defenders, Inc.

In reaching that conclusion, counsel considered and rejected for lack of arguable merit several appellate challenges, which he lists for our potential reconsideration in our independent review. Those issues are:

1. Whether the trial court erred by denying defendant's motion to suppress the recorded statements he made to Detective Kirkland.

2. Whether the trial court properly instructed the jury on voluntary intoxication and its effect on malice aforethought, and the lesser offense of involuntary manslaughter.

3. Whether the prosecutor committed prejudicial error by arguing to the jury that defendant was guilty of implied malice murder because he chose to get so drunk that he became unconscious.

4. Whether defendant's 40-years-to-life prison sentence amounted to cruel and unusual punishment.

5. Whether the trial court abused its discretion by refusing to strike the firearm-use enhancement in the interests of justice under section 1385, subdivision (c).

We have reviewed these issues, among others in our independent review, and find no arguable error.

6

Next we address the five issues defendant raises in his supplemental brief. Three of those enumerated claims relate to the restaurant security footage. None have merit.

First, defendant contends the court erred by directing the prosecutor to meet with a prosecution witness over the lunch recess to, as defendant phrases it in suggesting error or impropriety, "show him a video in preparation for [his] testimony"; moreover, the video "was different from what the jury ultimately viewed." The record shows the purpose of the meeting was to locate the relevant footage from the restaurant's security tape, which the prosecutor and the witness had been scrolling through fruitlessly in court. The court therefore suggested they "mark the time" in the footage during the recess "so the jury doesn't have to sit here any longer while we wait." There was no error in doing so. (Evid. Code, § 765, subd. (a) ["The court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth"]; Cal. Stds. of Jud. Admin., § 2.20 ["The trial judge has the responsibility to manage the trial proceedings"].)

Similarly, there was nothing nefarious in the prosecution using its copy of the security tape during the lunch break to locate with the witness the time stamp at which the witness first saw himself and other relevant patrons. As the prosecutor noted, he did so rather than requesting the video that was marked as a court exhibit, which was the one played for the jury. This was prudence for a routine ministerial task, preventing error or loss in the handling of court exhibits. Likewise wholly without merit is defendant's additional claim that the court erred by allowing the witness to refer to a note during his testimony, rather than testifying "only from his memory." The prosecutor requested the

7

court's permission for the witness to do so and the note simply reflected the exact time stamp—down to the second—at which to begin playing the relevant footage.

Defendant's third contention regarding the security video is that, after reviewing the footage "with the prosecution attorney," the witness's testimony "changed significantly," raising "concerns" according to defendant "about whether his testimony was improperly influenced." In open court, after viewing the same footage the jury saw, the witness acknowledged defendant had a tattoo on his left arm, rather than on his right arm as the witness earlier testified. The witness also based his certainty about which person depicted in the video was the shooter in part on the person's shoes (Converse sneakers) and the logo on his hat, while also acknowledging he earlier testified the person wore a jacket and a white t-shirt, which we infer the footage did not show. Such discrepancies were for the jury to evaluate among a host of witness credibility factors, as the court instructed (CALCRIM No. 315); there was no error.

Defendant's fourth claim of error is that the trial court improperly instructed the jury "using CALCRIM 251 (specific intent) when it should have instructed under CALCRIM 252 (general intent)." Defendant relies on the court's self-assessment of error, which turns out to have been misplaced. The court stated that during a break in the proceedings it came to believe it gave the wrong instruction concerning the alleged personal use and intentional discharge of a firearm allegations. (§ 12022.53, subds. (b), (c), (d).) The court explained on the record: "I read the jury—CALCRIM 251, which indicated that the allegations were specific intent crimes. They're actually general intent crimes. And CALCRIM 252 should have been read reflecting that. I discussed that with

8

counsel. We're all in agreement. I will substitute out 251 for 252 when I send it back to the jury; is that correct?" Counsel each assented, "Yes, your Honor" and "Yes."

Everyone's recollection was mistaken. The mistake was apparently based on the court's earlier stated list of the instructions it intended to read to the jury, which included CALCRIM No. 251, with no mention of CALCRIM No. 252. In actually reading the instructions to the jury, however, the court correctly gave the latter instruction and did not mention the former. The court also provided the jury, as it said it would, CALCRIM No. 252 in the written instructions—correctly tailored to the general intent firearm allegations. (See, e.g., *People v. Offley* (2020) 48 Cal.App.5th 588, 598 [§ 12022.53, subd. (d) "is a general intent enhancement, and does not require the prosecution to prove that the defendant harbored a particular mental state as to the victim's injury or death"].) Defendant's claim of instructional error is wrong.

Finally, defendant requests that we "review" *People v. Nino* (2025) 111 Cal.App.5th 844 regarding whether "the new invalid malice . . . principles in that case apply to my situation." Section 1172.6 has no application here.

We have independently reviewed the record for potential error, including beyond those listed by counsel or raised by appellant—none of which furnish any basis for reversal. Based on our review, we are satisfied defendant's attorney has fully complied with the responsibilities of counsel and no arguable issue exists. (*People v. Kelly* (2006) 40 Cal.4th 106, 126; *People v. Wende*, *supra*, 25 Cal.3d at pp. 441-442.)

9

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____

Acting P. J.

We concur:

CODRINGTON_____

J.

RAPHAEL_____

J.